UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

JACKIE DON ROBERTS and
VICKIE MAE ROBERTS,                    Case No. 18-11927-t12

　　　　Debtors.

## **OPINION**

Before the Court is a lessor's stay relief motion, brought so he could pick up two pieces of farm equipment leased to the debtors. Debtors and their secured lender object, arguing that the lease is really a security interest and the lessor an unsecured creditor. The Court, having heard the testimony of the parties and reviewed the relevant documents, concludes that the lease is a "true lease." As lease payments have not been made and debtors do not propose to assume the lease and cure the defaults, the lessor is entitled to relief.

I.　　FACTS

The Court finds:[1]

Debtors have farmed in Curry County, New Mexico for forty years. Sid Strebeck has farmed and ranched in Curry County for about as long. Strebeck also has a number of other businesses. From what the Court can tell, Strebeck is a wealthy man.

Debtors and the Strebecks have been friends for 20 years. Strebecks' son and Debtors' daughter were married for 16 years and have four children. To this day, Mr. Roberts and Strebeck

---

[1] The Court took judicial notice of the docket in this case. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

openly express friendship and respect for one another and acknowledge their shared love for, and connection through, their grandchildren.

Strebeck, via two of his business entities, owns a J. Bond & Sons 3048 manure spreader and a John Deere 544K 4WD loader (together, the "Equipment").[2] In early 2016, the Equipment was worth about $165,000. The loader is owned free and clear; the spreader is subject to a lien in favor of John Deere.[3]

In January 2016, Strebeck and Roberts entered into an oral agreement whereby Strebeck leased the Equipment to Roberts for five years. The impetus for the deal was that Roberts' main lender told him that he could not buy any new farm equipment. Despite this prohibition, Roberts thought he needed and could make profitable use of the Equipment. In his testimony, Strebeck characterized the transaction as a "lease." When Roberts testified, he described the transaction as a "lease to purchase."

Based on the testimony of Strebeck and Roberts, the terms of the lease (the "Equipment Lease") were:

- Roberts would take immediate possession of the Equipment;
- Robert was responsible for maintaining the Equipment;
- Strebeck was responsible for insuring the Equipment;
- Starting in 2016, Roberts would pay Strebeck $35,000 a year for five years. Each payment was due before March 31;
- In lieu of cash, Roberts could spread manure on Strebeck's farmland. Roberts would get a credit toward the annual lease payment of $3.50 for each ton of manure spread;
- If Roberts made the payments on time, the transaction would not involve the payment of interest. If Roberts did not make payments timely, interest would accrue on late payments at 6%;
- If Roberts paid as agreed, he could buy the Equipment after five years for $1;

---

[2] Five S Properties LLC owns the loader. Master's Properties, LLC owns the spreader. Strebeck is the sole owner of both LLCs. In 2016 one of Strebeck's sons was a minority owner of Master's.
[3] John Deere financed about $69,000 toward the purchase of the spreader. Master's is required to make five annual payments of $18,778.11, starting February 11, 2016.

- Roberts could buy the Equipment at any time during the five-year term for fair market value; and
- Roberts had the option, exercisable at any time, to terminate the lease and return the Equipment to Strebeck.[4]

Strebeck and Roberts never reduced the Equipment Lease to writing. Both testified that it is typical for Curry County farmers and businessmen to make deals on a handshake. The honesty and integrity of the contracting parties is paramount and, apparently, sufficient for the conduct of substantial business without a written agreement. Both men considered the other to have the necessary honesty and integrity needed for such "my word is my bond" transactions.

Under the Equipment Lease, Roberts made payments to Strebeck by check totaling $40,000 (two $10,000 payments in March 2016 and a $20,000 payment in May 2017).[5] On each check Roberts noted that the payment was for a "lease" or an "equip lease." Roberts also earned lease credits totaling about $50,000 by spreading manure on Strebeck's property.

Debtors filed this case on July 31, 2018.

In March 2019, Strebeck sent a text message to Roberts that a payment was due to John Deere for the manure spreader and reminding Roberts that they still needed to "settle up on last year's payment and figure out this year's." In April 2019, Strebeck sent a text message to Roberts indicating that he could purchase the loader and the spreader for $117,000 or "if it's better for you I'll just pick them up." Roberts then told Strebeck that the equipment could not be moved because it was involved in bankruptcy, and to expect a lawyer to follow up. After this exchange, the two

---

[4]Mr. Strebeck's uncontradicted testimony on this point was: Counsel: "What was the agreement between Five S Properties and Mr. Roberts?" Strebeck: "We would bring him the loader and anytime along the way he could turn it back to us or he could buy it at an agreed upon price." . . . Counsel: "What if Mr. Roberts terminated the agreement?" Strebeck: "Then he would not owe me anything else." Elsewhere Strebeck testified that the agreement was the same for both pieces of Equipment.

[5]The checks were made out to Strebeck Cattle Co., another wholly-owned Strebeck entity.

men met in person to discuss the Equipment Lease. At the meeting Strebeck told Roberts that if he could not pay for the Equipment as agreed, he could simply return it with "no hard feelings." Roberts did not return the Equipment, nor did he make any more payments.

Debtors originally listed Strebeck as a secured creditor with a $20,000 secured claim. They later scheduled him as the holder of an executory contract or unexpired lease. In a further amendment Debtors scheduled Strebeck as a creditor with a $50,000 claim, secured by the Equipment, valued at $70,000. Finally, Debtors proposed chapter 12 plan treats Strebeck as an unsecured creditor, whose claim would be offset by any damages awarded for his alleged violation of the automatic stay.

Five S and Master's filed claims on February 27, 2020.[6] Five S, the owner of the loader, filed a claim of $96,231. Master's, the owner of the spreader, filed a claim of $50,233. The claims characterize the arrangement between Strebeck and Roberts as an equipment lease.

At trial, both Strebeck and Roberts estimated the current value of the Equipment at about $100,000 (about $50,000 for each piece).

II.     DISCUSSION

A.   True Leases Versus Disguised Security Agreements.

The outcome of this dispute turns on whether the Equipment Lease is a "true lease" or a secured transaction disguised as a lease. If the latter, then Strebeck's rights would be significantly adversely affected. As described by one commentator:

> One purpose for distinguishing sales/secured transactions from leases is to decide the need for perfection. In other words, the lessor need not notify the world of her retained interest, while the secured party must. What appears to be ownership by a debtor in possession of the collateral must by some notice device be shown to be subject to the secured party's right to repossess; what appears to be ownership by

---

[6] Both claims were filed well after the bar date of June 3, 2019. Debtors' motions objecting to these claims on timeliness grounds are pending.

the lessee in possession of the leased goods need not be signaled by a similar notice device. The reversionary interest of the lessor may remain hidden, while that of the secured party may not.

Richard L. Barnes, *Distinguishing Sales and Leases: A Primer on the Scope and Purpose of UCC Article 2A*, 25 U. Mem. L. Rev. 873, 882–83 (1995).[7] "The treatment afforded to 'true' lessors of personal property is far superior to the treatment given to holders of secured claims." *In re Grubbs Constr. Co.*, 319 B.R. 698, 710. (Bankr. M.D. Fla. 2005). *Grubbs* notes, for example, that true leases must be assumed or rejected and, if assumed, any defaults must be cured and future performance assured; that secured claims can be bifurcated; and that "true lessors" are not subject to the trustee's "strong arm powers." *Id*.

Broadly, "[a] lease involves payment for the temporary possession, use and enjoyment of goods, with the expectation that the goods will be returned to the owner with some expected residual interest of value remaining at the end of the lease term. In contrast, a sale involves an unconditional transfer of absolute title to goods, while a security interest is only an inchoate interest contingent on default and limited to the remaining secured debt." *In re Purdy*, 763 F.3d 513, 518 (6th Cir. 2014) (citations omitted). The party challenging the lease bears the burden of proving that it is a disguised security agreement. *Id.* at 519.

Section 1-203 of the Uniform Commercial Code (in New Mexico, NMSA § 55-1-203) outlines how to tell a true lease from a security agreement. The section provides in part:

> (a) Whether a transaction in the form of a lease creates a lease or security interest is determined by the facts of each case.
>
> (b) A transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee, and:

---

[7] Consistent with his understanding that the agreement was a lease, Strebeck, a relatively sophisticated businessman, did not file a financing statement.

    (1) the original term of the lease is equal to or greater than the remaining economic life of the goods;
    (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
    (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
    (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

B.  The "Bright Line" Test of 1-203(b).

NMSA § 55-1-203(b) provides what is commonly called a "bright line test" used to determine whether a transaction in the form of a lease is in fact a security agreement. *See, e.g., In re HP Distrib.*, LLP, 436 B.R. 679, 688-89 (Bankr. D. Kan. 2010); *In re Johnson*, 571 B.R. 167, 172 (Bankr. E.D.N.C. 2017); *In re ES2 Sports & Leisure, LLC*, 519 B.R. 476, 481 (Bankr. M.D.N.C. 2014).[8]

> [A] transaction creates a security interest if the lessee has an obligation to continue paying consideration for the term of the lease, if the obligation is not terminable by the lessee . . . *and* if one of four additional tests is met.

Official Comments to NMSA § 55-1-203 (emphasis added).

C.  A Lease that is Terminable at Will by the Lessee; the "One Factor" Test.

A crucial starting point in any § 1-203 analysis is whether the challenged lease can be terminated by the lessee. If it can, courts are split on the significance of that fact.

---

[8] Section 1-203(b) was intended to eliminate courts' reliance on "numerous factors believed to define secured sales" because such reliance "proved unworkable, producing inconsistency and unpredictability among court characterizing similar transactions." *Addison v. Burnett*, 49 Cal. Rptr. 2d 132, 135-36 (Cal. 1996), citing *Carlson v. Giacchetti*, 616 N.E.2d 810, 812 (Mass. App. 1993); *see also In re QDS Components, Inc.*, 292 B.R. 313, 329 (Bankr. S.D. Ohio 2002) ("the caselaw interpreting Old § 1-201(37) is not a seamless web, but rather a disjointed patchwork of decisions that simply cannot be reconciled."). In general terms, the older version of the UCC encouraged a focus on the intent of the parties, while the current version focuses on the "economic realities" of the transaction. *Addison*, 49 Cal. Rptr. 2d at 135-36; *Grubbs Constr. Co.*, 319 B.R. at 711.

1. <u>Courts Adopting the "One Factor" Test</u>. A number of courts have held that a lease terminable at will by the lessee is a true lease; no further analysis or weighing of factors is necessary. *See, e.g., In re Powers*, 983 F.2d 88, 90 (7th Cir. 1993) ("where a lessee has the right to terminate the lease before the option arises to purchase the property for no additional or nominal consideration, the lease is a true lease and cannot be a conditional sale"); *Addison*, 49 Cal. Rptr. 2d at 136 (if "the relationship is terminable by the lessee at any time, the instrument is a true lease"); *In re Yarbrough*, 211 B.R. 654, 657-58 (Bankr. W.D. Tenn. 1997) ("the fact that [an] agreement is subject to termination by the debtor at any time is sufficient for the court to hold that [it] is a lease."); *Excel Auto & Truck Leasing, L.L.P. v. Alief Indep. Sch. Dist.*, 249 S.W.3d 46, 55 (Tex. App. 2007) (because the leases at issue were terminable at will by the lessee, they were true leases and consideration of other factors was not necessary); *In re Arthur Rigg*, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("a lease agreement can be construed to create a security interest only if the agreement prohibits the lessee from terminating the lease"); *In re Copeland*, 238 B.R. 801, 805-06 (Bankr. E.D. Ark. 1999); *Central Rents, Inc. v. Johnson (In re Johnson),* 203 B.R. 498, 503 (Bankr. S.D. Ga. 1996); *Rent–A–Center v. Spears (In re Spears)*, 146 B.R. 772, 774 (Bankr. S.D. Ill. 1992) (quoting *In re Marhoefer Packing Co. Inc.,* 674 F.2d 1139, 1142–43 (7th Cir. 1982)).

A widely respected treatise on the Uniform Commercial Code also sides with this interpretation of 1-203(b):

> If a document is 'subject to termination by the lessee,' section 1-203 implies that it is a lease and not a security agreement.[1] [footnote—A lessee's right to terminate a lease at will precludes recharacterization of the lease as a sale and security agreement. (citations omitted)].

White, Summers & Hillman, Uniform Commercial Code 30:10 (6th ed.). *See also* § 55-1-203, Official Comments ("A security interest is created only if the option price is nominal and the conditions stated in the introduction to the second paragraph of subsection [(b)] are met").[9]

2. <u>Courts Rejecting the "One Factor" Test</u>. Other courts have rejected the view that a lease terminable at will by the lessee at any time must perforce be a true lease. *See, e.g., In re Sellers*, 1994 WL 806097 (Bankr.N.D.Ala.1994); *In re Barnhill*, 189 B.R. 611, 615 (Bankr. D.S.C. 1992); *Rent–A–Center v. Shelby (In re Shelby)*, 127 B.R. 682, 691 (Bankr. N.D. Ala. 1991); *In re Burton*, 128 B.R. 807, 813-14 (Bankr. N.D. Ala. 1989), aff'd, 128 B.R. 820 (N.D. Ala. 1989); *In re Aguilar*, 101 B.R. 481, 483 (Bankr. W.D. Tex. 1989) (quoting *Waldron v. Best TV & Stereo Rentals, Inc.,* 485 F. Supp. 718, 719 (D. Md. 1979)); *Consumer Lease Network, Inc. v. Puckett (In re Puckett),* 60 B.R. 223, 239 (Bankr. M.D. Tenn. 1986). These cases involve consumer "rent to own" leases. Courts rejecting the "one factor" test with these leases generally are concerned that the right to terminate is illusory because it would involve a forfeiture of a down payment or security deposit. *See, e.g.*, *Puckett*, 60 B.R. at 239-40; *Shelby*, 127 B.R. at 691-92.

If the "one factor" test is rejected, then the court must consider all the facts of the case to determine whether the "economic realities" of the agreement indicate a lease or a security agreement. *See, e.g., In re Phoenix Equip. Co., Inc.*, 2009 WL 3188684, at *7 (Bankr. D. Ariz.) ("if the lease is terminable by the lessee . . . then a security interest will not be conclusively found to exist, and the court will need to consider other factors."). The "touchstone" of the economic realities test is "whether the lessor retains an economically significant reversionary interest[.]" *Addison*, 49 Cal. Rptr. 2d at 136-37, citing *In re Allen*, 174 B.R. 293, 295 (Bankr. D. Or. 1994);

---

[9] *See also* 12 C.F.R. § 226.2(16) (defining a credit sale for Truth in Lending purposes to include a lease unless the lease is terminable without penalty at any time by the consumer).

*see also* White, Summers & Hillman, Uniform Commercial Code, § 30-14 ("If there is a meaningful reversionary interest-either an up-side right or a down-side risk-the parties have signed a lease, not a security agreement").

D.   Under Either Approach, the Equipment Lease is a True Lease.

The Equipment Lease is terminable at will by Roberts at any time, without penalty. He has only to return the Equipment. Termination would not work a forfeiture on Roberts, as he made no down payment and did not post a security deposit. The termination right is an option Roberts could exercise if he deemed it in his bests interests to do so. Otherwise, he could pay the lease as agreed and take title to the equipment at the end of five years. The Court is inclined to end the inquiry on this finding and declare the transaction a true lease.

Even if other facts must be weighed, the result is the same. Had Roberts decided to terminate the lease and return the Equipment to Strebeck, the Equipment would have had substantial value, regardless of when termination occurred. Upon termination, Strebeck could have used the Equipment himself, re-leased it, or sold it. Strebeck has and always has had a "meaningful reversionary interest" in the Equipment. This is shown conclusively by the fact that the Equipment is worth about $100,000 today.

Furthermore, Roberts' right to terminate was never illusory. When he struck the deal in 2016, it probably would have been advantageous for Roberts to make all the lease payments and then buy the Equipment for $1. On the other hand, Roberts was in financial difficulty in 2016, as he is today. If at any time Roberts could no longer afford to make the lease payments, Strebeck gave him the option of returning the Equipment and walking away from the lease.

Thus, Roberts had the best of both worlds: he gained immediate use of the Equipment with no money down and had the right to buy it for $1 if he could afford to make the reasonable lease

payments; alternatively, Roberts had the right to use the Equipment as long as he could afford it, and then return it with no further obligation. The economic realities of the transaction, like the right to terminate at will, are consistent with the transaction being a true lease.

Debtors and PCA rely primarily to the nominal buyout at the end of the lease term to support their argument that the transaction is a disguised secured sale. The reliance is misplaced. A nominal buyout is conclusive evidence of a security agreement *only if the lease is not terminable*. NMSA § 55-1-203(b). As Roberts had the right to terminate the Equipment Lease at any time without penalty, the nominal buyout is not conclusive. Roberts' nominal buyout right made the lease more favorable to him but did not turn the transaction into a secured sale. *See, e.g., In re Powers*, 983 F.2d 88, 90-91 (7th Cir. 1993) (transaction was a true lease despite a nominal buyout at the end because lessee had the right to terminate the lease at any time); *In re Marhoefer Packing Company, Inc.*, 674 F.2d 1139 (7th Cir. 1982) (same). The economic reality of the deal remained the same, i.e., Strebeck at all times retained a meaningful reversionary interest in the Equipment, should Roberts elect to terminate the lease.[10]

E.   The Statute of Frauds Does Not Prohibit Enforcement of the Equipment Lease.

NMSA § 55-2A-201 prohibits enforcement of a lease of goods for more than $1,000 "unless there is a writing, signed by the party against whom enforcement is sought or by that party's authorized agent, sufficient to indicate that a lease contract has been made between the parties and to describe the goods leased and the lease term." NMSA § 55-2A-201(1). There is an exception, however, if the leased property "ha[s] been received and accepted by the lessee." NMSA § 55-2A-201(4)(c). Because Roberts received and accepted the Equipment in 2016 and has

---

[10] This conclusion is bolstered by the fact that Strebeck insured the Equipment.

-10-
Case 18-11927-t12    Doc 489    Filed 05/22/20    Entered 05/22/20 15:06:08 Page 10 of 11

been using it ever since, the lack of a writing does not prevent enforcement of the Equipment Lease.

### III. CONCLUSION

Strebeck leased the Equipment to Roberts on favorable terms, primarily to help him out. The payment terms are reasonable and Roberts had the right to terminate the lease if he chose or had to. Both men likely had the expectation that Roberts would complete the lease payments and own the Equipment at the end, but the early termination safety valve was an important concession to Roberts' financial reality.

Roberts has not paid the lease as agreed and now proposes (prompted, it seems, by his counsel and his main lender) to deprive Strebeck of both ownership of the Equipment and any meaningful payment. Under these facts Strebeck is entitled to stay relief, without prejudice, however, to Debtors' right to file an immediate motion to assume the Equipment Lease and cure all defaults.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: May 22, 2020
Copies to: counsel of record